NEWMAN, Circuit Judge,
dissenting.
The dispositive issue is the scope of the term “code” as used in claim 1; that is, does “code” include a scrambling code, or is it limited to the definition and usage of “code” in the specification. The meaning created for “code” by the panel majority is unsupported by and outside of the specification, where the majority’s definition is neither described nor enabled. It is different from the meaning and usage that a person experienced in the field of the invention would understand on reading the specification.
Technical terms in patents have the meaning that the patentee gave them. The Commission correctly construed “code” as a spreading code, for that is how *1331 the patentee described it. The patent states that the code is a spreading code, and that a spreading code generator is used to produce the code. No other form of code, although well known in this art, is mentioned or suggested for use in the ramp-up that is the subject of the patented invention. Nonetheless the panel majority holds that “code” in claim 1 includes a scrambling code, and on this ground reverses the Commission’s ruling of non-infringement.
The Commission, in construing “code” as a spreading code, observed that a scrambling code is nowhere mentioned in the specification, although the scrambling code was well known in this field of technology. The panel majority invokes the “doctrine of claim differentiation,” and holds that since “code” is specified as a “spreading” code in claim 5, then it necessarily includes all other codes in claim 1. However, the doctrine of claim differentiation does not permit enlarging a claim term beyond its presentation in the specification. A technical term in a patent claim is construed in accordance with its description and enablement in the patent; it cannot be construed more broadly in a claim, than its description in the specification.
The spreading code is the only code that is described for ramp-up. Omitting the qualifier “spreading” from claim 1 does not enlarge the description and enablement of the patented invention. From this erroneous claim construction, and the ensuing reversal of the Commission’s finding of non-infringement, I respectfully dissent.
Discussion
The Commission held that the ramp-up “code” is a spreading code, because it is described as a spreading code, produced by a spreading code generator, and no other form of code is suggested. The patent specification explicitly and insistently repeats that a spreading code is used for the short code ramp-up. Nokia points to the technological differences between the codes, in that its scrambling code does not change the frequency curve, as does a spreading code. Nokia explains that:
Spreading is the means by which multiple users can use the same frequency band at the same time. Scrambling does not enable multiple users to share a frequency; its purpose is to provide separation for signals that might otherwise look the same. Spreading applies chips to data at a rate differential. Scrambling, in contrast, applies a code at the same rate as the information being scrambled.
Nokia Br. 54. Instead, the panel majority reconstructs and redefines “code” in a manner that distorts the term from its presentation in the InterDigital patents. The majority adopts the language used by the Commission, as urged by InterDigital, defining “code” as “a sequence of chips that is transmitted,” but gives no weight at all to the Commission findings that:
All of the codes recited in the common specification are described as being generated from a spreading code generator. Although these codes may not be used to spread data during the claimed access procedure, they are still the types of codes that are intended to spread data because they have a higher chip rate than a data signal.
Comm. Br. 37. No error has been assigned to these findings, although only spreading codes are supported by the specification. See Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed.Cir.2005) (en banc) (the claim’s meaning is determined by the specification). In the specification only a “spreading code” is described for use in the CDMA system of this invention:
In a CDMA system, the same portion of the frequency spectrum is used for communication by all subscriber units. *1332 Each subscriber unit’s baseband data signal is multiplied by a code sequence, called the “spreading code,” which has a much higher rate than the data. The ratio of the spreading code rate to the data symbol rate is called the “spreading factor” or the “processing gain.” This coding results in a much wider transmission spectrum than the spectrum of the baseband data signal, hence the technique is called “spread spectrum.” Subscriber units and their communications can be discriminated by assigning a unique spreading code to each communication link which is called a CDMA, channel.
'966 Patent col.2 11. 1-12 (all boldface added). The patents state in the Summary of the Invention that “The short code is a sequence for detection by the base station which has a much shorter period than a conventional spreading code.” Id. col.3 11. 23-25. The patents state that “[t]he pilot code 40 is a spreading code which carries no data bits.” Id. col.5 11. 9-10. The patents state, describing Figure 10:
The transmitter section 74 comprises a spreading code generator 86 which generates and outputs spreading codes to a data transmitter 88 and a short code and access code transmitter 90. The short code and access code transmitter 90 transmits these codes at different stages of the power ramp-up procedure as hereinbefore described.
Id. col.10 11. 10-15. The patents stress that the short codes and access codes are produced by a spreading code generator, Id. col.6 11. 53-54.
The '847 Patent states that the “regular length spreading code” is used to spread the “subscriber unit’s baseband data signal.” '847 Patent col.2 11.1-10. The Inter-Digital patents describe use of the transmitted spreading code, or a short spreading code form, until the proper power level is reached and the data are transmitted; id., col.8 1. 15 — col. 9 1. 6, and then are used to increase the bandwidth of the data signal after the power ramp-up process is complete.
In addition, InterDigital’s expert Mr. Vojcic, Nokia’s expert Mr. Lanning, and inventor Dr. Fatih Ozluturk, all testified that the short codes described in the '966 and '845 specifications are spreading codes. Dr. Ozluturk also stated that “some of these codes, such as the short codes and the access code that I mentioned previously, are the examples of codes that do not spread anything. And they are there for timing reference and as indicators.” Testimony of Dr. Ozluturk, Trial Tr. 126:16-127:25, May 26, 2009.
InterDigital’s expert, Dr. Vojcic, also acknowledged that the spreading codes do not necessarily spread bandwidth:
Q. Yes. Dr. Vojcic, you indicated spreading codes do not necessarily increase the bandwidth of an information signal.
Are there codes in the '004 patent which are spreading codes but do not increase the bandwidth of information signals?
A. Yes, there are. Like pilot code, short code, and access code.
Trial Tr. 383:19-384:4, May 26, 2009. Dr. Vojcic further testified:
Q. Now, you would agree with me that in the context of the '004 patent, a short code is just part of a spreading code?
A. Yes, I do agree with that.
Trial Tr. 609:4-7, May 26, 2009. Inventor Dr. Ozluturk testified similarly:
Q. You have introduced this term short code in your description of the solution to the interference problem for the access procedure technology. What is a short code in that context?
A. Well, in this context, the short code is a spreading code, just like all the other codes we use in broadband *1333 CDMA. As a spreading code, it is a sequence of chips, chip values.
Trial Tr. 126:16-23, May 26, 2009.
No witness, no expert, no inventor, testified that the code described for ramp-up in the InterDigital patents as a scrambling code. The ALJ reviewed the evidence, and in light of InterDigital’s argument that the PRACH scrambling code is a spreading code, including the “UMTS; Spreading- and modulation (FDD) (3GPP TS 25.213 version 5.6.0 Release 5),” which describes spreading as follows:
Spreading is applied to the physical channels. It consists of two operations. The first is the channelization operation, which transforms every data symbol into a number of chips, thus increasing the bandwidth of the signal. The number of chips per data symbol is called the Spreading Factor (SF). The second operation is the scrambling operation, where a scrambling code is applied to the spread signal.
The Commission observed that this document refers to a channelization code as a “spreading code,” while a scrambling code is referred to as a separate code. In the Matter of Certain 3G Mobile Handsets and Components Thereof, 2010 ITC LEXIS 666 at *134 (ITC October 14, 2009) (“Final Determination”). The Commission also mentioned InterDigital’s admission that the PRACH preamble is not used or intended for use to increase the bandwidth of another signal, and is not the type of code that is a spreading code. Id. at *148.
The panel majority, ignoring these findings, simply finds “that the term “spreading code” is used somewhat loosely by those working in the field of cellular communications.” Maj. Op. 1327. Such loose usage is not apparent in the record. The record shows that the witnesses knew what they were saying, in this high-stakes litigation, and that the inventors knew' what they wrote in their patents: The rules of claim construction do not permit unsupported departure from the technical terms used by the inventors in describing their invention. There was no evidence at all that “spreading code” is understood by persons in the field as “scrambling code.” The record shows that persons in the field of this invention fully understood the meaning of these common terms, and did not use them “loosely.” The court’s theory that there is “no sharp distinction” between a spreading code and a scrambling code does not convert the technologically distinct scrambling code into a spreading code, or redefine “spreading” to include “scrambling,” contrary to the well-understood meaning of those terms.
“The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.” Phillips, 415 F.3d at 1313. InterDigital’s patents consistently describe this code for this use as a “spreading code.” See '966 Patent col.5 11. 9-10 (“The pilot code 40 is a spreading code which carries no data bits.”);, id., col.6 11. 20-23 (“The access code 42 is a known spreading code transmitted from a subscriber unit 16 to the base station 14 during initiation of communications and power ramp-up.”).
The Commission held that, “the asserted claims each relate to a CDMA system, [and] the specification discloses that CDMA systems use spreading codes.” Final Determination at *69. The Commission placed dispositive weight on this emphasis in the InterDigital patents on the use of spreading codes in the ramp-up. The Commission found, and it is not disputed, that the Nokia scrambling code does not provide a data rate differential or increase in bandwidth. The Commission found that the PRACH preambles of the NOKIA handsets are not spreading codes or generated from spreading codes, that *1334 they do not perform channelization, and cannot be used to increase bandwidth. Id. at *88-89. These findings are supported by more than substantial evidence.
The Commission did not err in determining that the InterDigital claims do not include Nokia’s scrambling code, whether or not a scrambling code signal can increase the signal bandwidth. The InterDigital patents describe only spreading codes, and do not suggest any alternative to the short spreading code in the ramp-up phase. The panel majority’s reliance on the “doctrine of claim differentiation” is misplaced, for this “doctrine” can not enlarge the meaning of claim terms beyond their presentation and support in the patent document. As stated in Tandon Corporation v. International Trade Commission, 831 F.2d 1017, 1024 (Fed.Cir.1987), “Whether or not claims differ from each other, one can not interpret a claim to be broader than what is contained in the specification and claims as filed.” See also, e.g., Retractable Techs., Inc. v. Becton, Dickinson & Co., 653 F.3d 1296, 1305 (Fed.Cir.2011) (finding claim differentiation to be rebutted where “the specifications do not disclose a body that consists of multiple pieces or indicate that the body is anything other than a one-piece body”); quoting Seachange Int’l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1369 (Fed.Cir.2005); Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1302 (Fed.Cir.1999) (“the doctrine of claim differentiation does not serve to broaden claims beyond their meaning in light of the specification”); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1480 (Fed.Cir.1998) (“the doctrine of claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence”); O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1582 (Fed.Cir.1997) (“Although the doctrine of claim differentiation may at times be controlling, construction of claims is not based solely upon the language of other claims; the doctrine cannot alter a definition that is otherwise clear from the claim language, description, and prosecution history.”).
Only spreading codes and short spreading codes are shown in the InterDigital patents. The common specification defines a “spreading code” as a code having “a much higher rate than the [subscriber unit’s baseband] data” and which spreads data at a specific symbol rate called the “spreading factor” or “processing gain.” '966 Patent, col.2 11. 3-7. The patents describe the drawings accordingly, as showing that “the transmit spreading code generator 64 outputs a spreading code to the data transmitter 66 and the pilot code transmitter,” id., col.9 11. 50-53; and that “[t]he transmitter section 74 comprises a spreading code generator 86 which generates and outputs spreading codes to a data transmitter 88 and a short code and access code transmitter 90.” Id., col.10 11. 10-13. Each of the codes identified in the common specification exhibits a higher data rate than the subscriber unit’s baseband data, has a specific “spreading factor” or “processing gain,” and is generated by a spreading code generator. This description supports the Commission’s construction of “code” as a spreading code that initiates contact during the power ramp-up phase, and then spreads to transmit data after contact has been achieved. There is no support whatsoever, anywhere in the patents, for the panel majority’s construction of “code” as including a scrambling code for these purposes.
The limitation in all the claims that a “same code” is used for ramp-up and for the message conforms to the Commission’s construction that the ramp-up code is lim *1335 ited to its description in the specification as a spreading code for use in the CDMA system that is the basis of the InterDigital patents. The Commission correctly found that “the presumption created by claim differentiation is rebutted,” Final Determination at *69, and correctly ruled that the codes referenced in the specification and the claims are all spreading codes. Id.
The panel majority’s enlargement beyond the invention described in the patents, in disregard of the protocols of claim construction, simply adds uncertainty to the patent grant. See Phillips, 415 F.3d at 1315 (“the words of the claims must be based on the description” in the specification). In today’s technology-based commerce, rational economics requires that the patent provide a reliable basis for investment. The patentee is in control of the specification that describes the invention. The panel majority’s theory that “the inventors’ failure to include a reference to the alternative embodiment in the specification does not justify excluding that embodiment from the coverage of the claims,” Maj. Op. at 1328, is a departure from routine rules of the meaning of legal documents, and in negation of the notice purpose of the patent claim. From this unsound approach to claim construction, and its incorrect conclusion on the facts of this case, I respectfully dissent.